**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DONNA GUSTAFSON, et al.,** )<br>)<br>       **Plaintiffs,** )<br>)<br>**v.** )<br>)<br>**ILLINOIS STATE BOARD OF** )<br>**ELECTIONS, et al.,** )<br>)<br>       **Defendants.** ) | **No. 06 C 1159**<br><br>**HONORABLE DAVID H. COAR** |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, all of whom are voters in and around Chicago,[1] have brought suit against

Defendants Illinois State Board of Elections ("State Board") and various individuals[2]

(collectively "Defendants") for violations of the First Amendment and the equal protection

clause of the Fourteenth Amendment. This Court has authority over this matter under 28 U.S.C.

§ 1343(2). Plaintiffs claim that Defendants failed to correct constitutional failings in article 19A,

a newly created law establishing early voting procedures for Illinois voters. *See* 10 ILCS 5/19A

---

[1]In their Second Amended Complaint, Plaintiffs claim to bring this case on behalf of a putative class of voters, further divided into a subclass of City of Chicago voters and another subclass of voters in the outlying suburbs. However, no formal certification motion has been filed and therefore the issue is not before this Court. The current list of named Plaintiffs includes: Donna Gustafson, John Gustafson, Scott Turner, Victor J. Sholis, Guadalupe Castaneda, Carrie McAteer-Fournier, Joyce Ann Eaker, Andrea Raila, Donna Hriljac, Maria Phifer, and Jennifer Roniger, and all registered to vote in the City of Chicago, or suburban Cook County, or Elgin.

[2]The individual Defendants are all members of the State Board, and include Jessie Smart, Wander Rednour, Bryan Schneider, Patrick Brady, Robert Walters, John R. Keith, William McGuffage, and Albert Porter.

*et seq.* Before this Court are Defendants' Motion for Summary Judgment[3] (Doc. No. 92) and

Plaintiffs' Motion for Summary Judgment (Doc. No. 96). For the reasons stated below,

Defendants' motion for summary judgment is GRANTED and Plaintiffs' motion for summary

judgment is DENIED.

## 1.    FACTS

In Illinois, early voting is codified by article 19A of the Illinois Election Code ("article

19A"). By statute, early voting is made available from the twenty-second to the fifth day before

an election, 10 ILCS 19A-15, and must be done in person. Defs.' Facts ¶ 4. Early voting is

conducted by local "election authorities," defined in the Election Code as "a county clerk of

Board of Election Commissioners." 10 ILCS 5/1-2(8). However, ultimate responsibility for such

voting procedures rests with the State Board. *See* 10 ILCS 5/1A-8. This early voting scheme

was first used in the Illinois elections of 2006.

Most of the counties and a number of the cities conducted early voting at one location in

their jurisdiction, typically the county clerk's office or election board office. Defs.' Facts ¶ 9.

Many of these districts' election authorities offered early voting exclusively at the County

Clerk's office, while other counties held polling at other government sites, such as village

offices. Pls.' Facts ¶ 6. However, a significant number of counties and municipalities allowed

for early voting at multiple sites. Defs.' Facts ¶¶ 10-22.[4] The Illinois Election Code

_____

[3]As filed, this document is actually titled "Defendants' Motion to Dismiss, or in the
alternative, Motion for Summary Judgment." However, on January 10, 2007, this Court ruled
that the motion would be considered as a motion for summary judgment.

[4]Specifically, the City of Chicago had 26 sites, Cook County 32, DuPage County 18,
Kane County 12-15 land (plus 28 "votemobile" sites), Lake County 23, Madison County 14,
McHenry County 5, McLean County 4, City of Peoria 3 Peoria County 11, Perry County 2, and

distinguishes between permanent and temporary early voting sites.  Id. ¶ 23.  Temporary sites

can be open fewer hours or days for early voting.  Id.  Not all early voting sites within or across

counties were open the exact same hours.  Id.  Some election authorities with multiple early

voting sites could provide all ballot styles used in their jurisdiction at all early voting sites, e.g.,

Chicago, while others did not have all ballot styles available at every site.  Id. ¶ 24.

Twenty of the twenty-five counties surveyed by Plaintiff did not conduct any Sunday

early voting and eight conducted no weekend voting on either day.  Pls.' Facts ¶ 1.  Several

counties failed to follow the mandate of article 19A that weekday hours be either 8:30 a.m. to

4:30 p.m. or 9:00 a.m. to 5:00 p.m.  Id.  Various counties had widely differing numbers of voters

per early polling location, though the parties dispute the significance of this difference.  Id. ¶ 2-3.

Kane County, in addition to having at least 15 stationary sites, operated a "votemobile" which

traveled to 28 different sites in the county, permitting early voting for one day at each site.  Id. ¶

4.  Rock Island County obtained a federal grant under the Help America Vote act to conduct

early election voting by "trolleys" which also moved to different sites in the county.  Id. ¶ 5.

DuPage County and the City of Peoria provided individual mailed notices to voters, while all

other counties would provide notice of early polling information via newspapers, websites,

and/or signs posted at the location itself.  Pls.' Facts ¶¶ 8-9.

The total percentage of early votes cast in the jurisdictions in question varied between

1.1% and 9.4% of the total voter turnout.  Id. ¶10.  There is some disagreement between the

parties as to the exact number of early votes that were counted by each local board of elections.

*See generally* Defs.' Add'l Facts.

_____

Will County 24.

## 2. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, she must go beyond the pleadings and support her contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving

party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment. *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004). The Seventh Circuit has made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). However, it is possible to rebut a motion for summary judgment with the allegations of a complaint, but only to the extent that they are based upon the plaintiff's personal experience. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (requiring that allegations are admissible at summary judgment under 56(e) so long as they are "based on personal knowledge and [set] forth specific facts showing that there is a genuine issue for trial"). The fact that those statements may be "self-serving" is not a valid grounds for deeming them inadmissible. *See id.*

3.     **ANALYSIS**

There is some confusion between the parties as to the present nature of Plaintiffs' claim. Defendants repeatedly attack the suit for failure to show a basis for holding the State Board or its

members responsible for the action or lack of action in question. Defendants alternately state that the Board does not have ultimate responsibility for the alleged wrongs and/or that all relevant parties have already been dismissed. Before addressing any of the substantive legal questions, it is therefore first necessary to clarify the nature of the claim now before this Court.

Plaintiffs have clarified their stance in open court, stating that this case is about "what we say this has always been about, the complete lack of criteria and standards in the statute who are adopted by the State Board of Elections." 7/20/2006 Tr. Similarly, at summary judgment they made clear that "[t]he gist of the Plaintiff's case is not that there are disparate impacts from a generally applicable state law but that there is no generally applicable state law." Pls.' Opp. to Summ. J. at 3. Therefore, as this Court understands the Plaintiffs' approach to this matter, they claim that the Defendants' had a duty under the election laws of this state to monitor, bolster, and enforce the voting laws of Illinois and, in light of the allegedly unconstitutional nature of article 19A, they are therefore responsible for the extent to which it violates voters' rights. Essentially, this amounts to a claim that the State Board could have protected the constitutionality of article 19A by creating more concrete early voting requirements for all jurisdictions but failed to do so.

Plaintiffs' equal protection and First Amendment claims brought under section 1983 are properly understood in this manner. After multiple parties have settled, the only remaining defendants against whom these claims are to be applied are the State Board and its members. This Court now turns to the substantive legal issues of the case to determine if summary judgment is warranted, for or against these remaining Defendants.

a.     Eleventh Amendment Protections and *Ex Parte Young*

Defendants maintain that, as a matter of law, summary judgment should be granted against all parties based on state entities' Eleventh Amendment protections and the scope of the limited exception of *Ex Parte Young*.  *See* Defs.' Summ. J. Mem. at 13-15 (citing *Ex Parte Young*, 209 U.S. 123 (1908)).  Plaintiffs do not address these defenses, other than stating that the Defendants, collectively, have the responsibility to oversee and implement voting procedures under Illinois law.  *See* Pls.' Opp. to Summ. J. at 6-8.

There is little doubt that the State Board is a state agency and, as such, is immune from suit absent consent or specific legislative mandate.  *See Pennhurst v. Halderman*, 465 U.S. 89, 100 (1984).  Plaintiffs fail to address this aspect of the motion for summary judgment, and indeed, there is little reason to do so where the law is clear and there is no indication that this case falls into an exception to the states' protection.  Defendants' motion for summary judgment is GRANTED insofar as this action was brought against the Illinois State Board of Elections, and all claims against it are dismissed.

With respect to the members of the State Board, however, additional analysis is warranted, in light of these Defendants' duties within the state bureaucracy and the purely equitable remedy demanded of them.  It is settled law that, despite state agencies' protections under the Eleventh Amendment, equitable relief is still available with respect to individual government officials.  *See Ex Parte Young*, 209 U.S. at 159-60.  Defendants, however, maintain that this exception does not apply to the members of the State Board because they are not responsible for the wrongs alleged in Plaintiffs' complaint.

Defendants misstate the claims of this case in an attempt to avoid individual defendant liability under *Ex Parte Young*. They maintain, without citation, that "[l]ocal election officials run early voting as a matter of state law." Defs.' Summ. J. Mem. at 14. Defendants continue to frame Plaintiffs' arguments in their favor, stating: "There is no claim remaining in this case that any county clerk or local Board of Election which has the actual responsibility for doing early voting is violating the Constitution. If early voting is unconstitutional, why are the local officials not defendants? There is no claim the State Board members are administering early voting in a discriminatory way." None of this is in dispute; as understood by this Court, Plaintiffs' remaining claim is not that early voting itself or local elections officials' implementation of early voting are unconstitutional, but rather that the failure of the State Board to bolster article 19A with universal standards ensuring consistent application is unconstitutional. Therefore, so long as this understanding of the action falls within the remaining Defendants' realm of responsibilities under state law, *Ex Parte Young* allows this action to continue. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997) ("[A] federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment.")

The State Board is responsible for "general supervision over the administration of the registration and election laws throughout the State." 10 ILCS 5/1A-1. The Election Code elaborates further, imposing on the Board a duty to: "[r]eview and inspect procedures and records relating to the conduct of elections...and to report violations of election laws to the appropriate State's Attorney," 10 ILCS 5/1A-8(7); "[a]dopt, amend or rescind rules and regulations in the performance of its duties...consistent with the provisions of this Article 1A or

issued pursuant to authority otherwise provided by law," 10 ILCS 5/1A-8(9); and "[s]upervise the administration of the registration and election laws throughout the State," 10 ILCS 5/1A-8(12). It can reasonably be inferred that the expansive "general supervision over the administration of the registration and election laws throughout the State" makes Defendants responsible for the constitutionality of those laws, at least in part.

Therefore, to the extent that Plaintiff's remaining claims are otherwise supportable by the record, the members of the State Board are appropriate Defendants under *Ex Parte Young*. Indeed, members of the State Board have in the past been amenable to claims based on voters' rights. *See, e.g., Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004) (implicating members of the State Board where injunctive relief was the sought-after remedy). Plaintiffs must nonetheless establish that there was a "causal connection, or an affirmative link" between the deprivation and the State Board members' conduct, as "[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in the alleged constitutional deprivation." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).

b.      First Amendment Claim

Defendants argue that article 19A does not severely restrict the right to vote – in fact it expands voting rights – and therefore cannot serve as a basis for First Amendment liability. Plaintiffs fail to address this argument in their summary judgment filings, other than a single paragraph that cites to *Celebreeze*, 460 U.S. at 788. *See* Pls.' Summ. J. Mem. at 15. This Court finds that article 19A represents an expansion of voters' ability to express their political viewpoint by expanding their right to vote or, in the worst of scenarios, leaving it as it was. In any event, the law does not restrict Plaintiffs' political expression and therefore represents such a

minimal, relative infringement on their speech that it would fail any First Amendment balancing against the government's interest. Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' First Amendment claim (Count I).

c.    Equal Protection Claim

Plaintiffs do not articulate their equal protection claim in the Second Amended Complaint, but in their motion for summary judgment state that "other than requiring that each county provide at least one early voting location, neither the General Assembly nor the State Board of Elections has established any guidelines or regulations ensuring uniformity of access to early voting throughout the State. As a result, in both the 2006 primary and general elections, wide variations of early voting availability existed, with some voters having much greater access to the polls than others, thereby depriving Illinois voters, and the candidates they supported, a fair election system." Pl.'s Summ. J. Mem. at 1. As a result of this "complete lack of standards requiring uniform access to early voting and...an obvious disparity of access to early voting on Chicago's lakefront and in many areas of suburban Cook County," Plaintiffs believe that the equal protection rights of them and those similarly situated were violated.[5]

The Fourteenth Amendment of the United States Constitution requires that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." To the extent that article 19A gave Illinois voters new rights under the law, once given, these rights were subject to the principle that "the right to vote as the legislature has prescribed is fundamental;

---

[5]Plaintiffs confuse matters somewhat by claiming that there was no law in place. If that is the case, it is unclear how the current dispute could have been triggered by a statute. It is in fact the enactment and implementation – and the extent to which those processes were incomplete – that failed to address constitutional concerns. This Court will interpret this as the act to be evaluated.

and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 529 (2000). Therefore, equal protection analysis must be applied to the extent that each voter's access to their voting rights was and is infringed by this law.

      i.  *Article 19A and its implementation are non-discriminatory*

   In order to succeed on their equal protection claim, Plaintiffs must establish that article 19A is discriminatory, either by showing that it is facially so or that it had an intentionally disparate impact on different voters.

   Though largely written in permissive terms, article 19A requires that each voting jurisdiction provide its voters with at least some opportunity to vote early and notice of that opportunity: early voting must fall between 22 and 5 days before the general election, 10 ILCS § 5/19A-15(a); "[a] permanent polling place for early voting must remain open during the hours of 8:30 a.m. to 4:30 p.m., or 9:00 a.m. to 5:00 p.m., on weekdays and 9:00 a.m. to 12:00 p.m. on Saturdays, Sundays, and holidays," 10 ILCS § 5/19A-15(b); and some notice be given of the times and locations of early voting, at a minimum amounting to an advertisement in a local paper, 10 ILCS § 5/19A-25. Essentially all other aspects of the early voting system – such as the use of mobile polling stations, the location of the permanent polling place, or additional methods of voter notification – are optional and/or only loosely defined.

   Plaintiff maintains that, on its face, this law is unconstitutional because it provides no protections to ensure that the early voting right will be apportioned between different districts so as to ensure equal protection. However, this law manifests no intent to invidiously discriminate based on race, class, or geographic location. Its obvious purpose is to expand the available

voting mechanisms for all Illinois voters. Plaintiff maintains that this law, insofar as it does make concrete demands on local election authorities, was not followed. To the extent that these clear regulations were thwarted or simply ignored, that is a significant enforcement problem.[6] However, this does not necessitate additional rulemaking. The law contains bare minimums that, if followed, will provide all Illinois voters with a new right to vote early; that it allows for district-to-district variation above and beyond those minimum standards is irrelevant to the fact that the language of the law gives each voter the ability to vote early, regardless of status.[7]

Therefore, the law being applied is neutral on its face, and Plaintiffs can only survive on their equal protection claim to the extent that they are able to otherwise establish intentionality. *Frock v. U.S. R. R. Retirement Bd.*, 685 F.2d 1041, 1048 (7th Cir. 1982) (examining facially neutral laws by way of impact, but only insofar as it reflects an underlying intent) (citing *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979). Equal protection claims brought on a disparate impact basis require some indication that the deprivation was intended. "An unwavering line of cases from [the Supreme Court] holds that a violation of the Equal Protection Clause requires state action motivated by discriminatory intent; the disproportionate effects of

---

[6]For example, several of the communities apparently failed to provide for weekend voting as was required. To the extent that the Cook County Clerk "permitted all of these defendants to designate their early voting polling places as 'temporary' in order to eliminate the requirement that the early voting polling places be open on Saturdays and Sundays," as Plaintiffs claim, better enforcement of the new law is clearly necessary. Therefore, the appropriate remedy for this obvious failing is not to draft and promulgate additional rules, but rather to enforce those *de minimis* provisions that are already on the books.

[7]Plaintiffs are incorrect that "there is no generally applicable state law." *See* Opp. to Def.'s Summ. J. Mem. at 3. Section 19 clearly sets out certain – albeit minimal – requirements regarding early voting. This law may be unsatisfying in terms of its level of detail or its scope, but this is nonetheless a far cry from saying that its enactment or its enforcement are nonexistent.

state action are not sufficient to establish such a violation." *Hernandez v. New York*, 500 U.S. 352, 372-73, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

This intent can be established through the introduction of evidence showing that the disparate effects were so clearly foreseeable that the intention can be inferred from the defendant's continued pursuit of the challenged course of action. Indeed, Plaintiffs maintain that the lack of standards in the new early voting requirements was so obvious, and the disparate implementation so foreseeable, that the State Board's intention should be inferred. However, in this instance there was no evidence that attaching only a *de minimis* standard to a new voting right would result in favoritism toward particular populations. Essentially, this law does not change anything in terms of the geographical or political biases with which the local election authorities might have acted, so the mere fact that such biases might be at play says nothing about the constitutionality of article 19A itself. District-to-district flexibility is something that was already a reality in Illinois election law before early voting was enacted, it will continue to be a reality in the future, and barring some clear constitutional violations, it is a continuing potentiality that must be dealt with by the State administration rather than a Federal court. The facts as they are presented in the record do not provide a clear indication of disparate impact sufficient to show intentional discrimination and warrant judicial intervention at this stage.

This lack of hard evidence of discriminatory effects is made clear by the Plaintiffs' own filings, that reiterate the largely speculative nature of their suit. Plaintiffs make strong allegations, for instance stating that the State Board "knows or should know of and has tolerated

and acquiesced in gross disparities in the right to engage in such early voting."[8]  However,

Plaintiffs repeatedly remind the Court in subsequent filings that these alleged "gross disparities"

are largely speculative.[9]  The only substantial evidence they put forth in support of such a claim

is that the rate at which counties voted early varied between 1.1% and 9.4% for each district's

total turnout.  Pls.' Facts ¶ 10.  However, the record provides this Court with no basis for finding

that the discrepancy evidences differences in voters' access to the early vote, rather than

differences in the rate at which voters chose to take advantage of that right.  This is not to say

definitively that availability did not play a role, but simply to show that there is no evidence of

the magnitude of the role that it played.  It may be, for example, that in some counties early

voting itself was more appealing than others, based on factors unique to those counties and

irrespective of the nature of the early voting mechanism or the disparate manner in which it was

applied.  Similarly, Plaintiff refers to the harm caused by article 19A's minimal standards in

largely speculative terms: "[b]ecause other communities did not conducting [sic] early voting on

any day, the number of suburban votes without access to weekend voting would have been even

higher," id. ¶ 9; "the potential disparity which the State Defendants would allow or permit is

virtually unlimited," Pl.'s Opp. to Summ. J. at 1.  The vague and speculative nature of Plaintiffs'

---

[8]The Second Amended Complaint contains other, similarly alarmist, language, including: "the entire statute is virtually designed to permit unconstitutional and inconsistent and politically discriminatory application," id. ¶ 4; "large numbers of voters did not have meaningful practical access to an early voting location," id. ¶ 6;

[9]By this Court's recollection, in open court Plaintiffs had presented other compelling evidence of differing accessibility to early voting.  However, the summary judgment filings contain only limited citations to the record, and this Court is not "obliged in our adversary system to scour the record looking for factual disputes...."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

supporting evidence is completely inconsistent with the alleged clarity of the constitutional wrongs that were taking place and the "gross disparities" against which Defendants failed to act.

Article 19A and its implementation are therefore facially neutral acts of the state, and there is insufficient evidence to find that any disparate impact that resulted was intended by Defendants. Therefore, intentionality is lacking and summary judgment is warranted.

        ii.     *Defendants' actions are rationally related to a valid government interest*

Even if it could be shown that Defendants' actions were intentionally or foreseeably discriminatory, Plaintiffs would still need to establish that the actions were inadequately related to a government interest. Plaintiffs maintain that the State Board should have "enacted and enforced requirements that early voting be conducted uniformly throughout the state," providing the "neutral criteria" for early voting that the statute lacked. 2nd Am. Compl. ¶ 12. A connection must therefore be drawn between Defendants' decision not to establish such criteria and a related interest of the state.[10]

There is some confusion between the parties as to the proper standard of review for the equal protection claim at issue. Defendants argue that rational basis review is appropriate, while Plaintiffs maintain that strict scrutiny should be applied. Where the challenged government action does not involve a suspect classification or a fundamental right, the statute will be upheld if it bears a rational relationship to a legitimate public purpose. Where fundamental rights are implicated, however, strict scrutiny applies. While the right to vote itself is clearly a

---

[10]At points, Plaintiffs frame Defendants' actions differently, asking this Court to judge them as if they consciously chose the ultimate result. *See, e.g.*, Pls.' Opp. to Summ. J. at 6. We do not accept this interpretation. Defendants chose to act in a limited manner, and they will be scrutinized according to this decision rather than all possible effects that the decision might have had.

fundamental right, *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), the manner in which that right is implemented moves into a grey area; where rights related to voting are in question, the Court must balance deference to the state's chosen mechanisms for implementing the vote and the need to ensure that voters are afforded equal protection. Confusion between the parties is foreseeable in light of the courts' widely varied approach to striking this balance.

The Supreme Court has stepped back from a previous interpretation that would have applied strict scrutiny to any action limiting voting rights. *See Winters v. Illinois State Bd. of Elections*, 197 F.Supp.2d 1110 (N.D. Ill. 2001) (comparing the strict stance of *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964) with *Burdick v. Takushi*, 504 U.S. 428, 432-33, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)). The landmark decision of *Bush v. Gore* nonetheless affirmed the proposition that fundamental rights *may* be implicated wherever voters' rights are disparately impacted by the law, even if the right is not denied outright. *See* 531 U.S. at 105 ("It must be remembered that the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.") (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). That said, only particularly threatening actions warrant strict scrutiny "depending upon the interest affected or the classification involved." *Dunn v. Blumstein*, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972). There is also a degree of deference given to state enactments in light of the need to structure elections and the reality that all such structure will necessarily impact voting rights to some degree. *See Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1570 (1983) ("Each provision of these schemes, whether it governs the registration and qualifications of voters, the

-16-

selection and eligibility of candidates, or the voting process itself, inevitably affects-at least to some degree-the individual's right to vote and his right to associate with others for political ends. Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.") (citations omitted) (hereinafter "*Celebreeze*").

The Supreme Court has held that, "because of the overriding importance of voting rights, classifications 'which might invade or restrain them must be closely scrutinized and carefully confined' where those rights are asserted under the Equal Protection Clause." *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807, 89 S.Ct. 1404, 1407 (1969) (citation omitted); *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) ("Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government."). While scrutiny of voting laws is therefore important, the Seventh Circuit has acknowledged the necessity of significant state-based restrictions on voting rights and eschewed formalized review processes:

> Because of this grant of authority and because balancing the competing interests involved in the regulation of elections is difficult and an unregulated election system would be chaos, state legislatures may without transgressing the Constitution impose extensive restrictions on voting. Any such restriction is going to exclude, either de jure or de facto, some people from voting; the constitutional question is whether the restriction and resulting exclusion are reasonable given the interest the restriction serves. No greater precision in the articulation of the governing standard seems possible.

*Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (citations omitted), *cert. denied*, 544 U.S. 923 (2005). Voluntary expansion of voting rights, such as absentee voting, may not warrant strict scrutiny. *McDonald,* 394 U.S. at 807 (declining a more exacting test because "the

distinctions made by Illinois' absentee provisions are not drawn on the basis of wealth or race," and "there is nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote").

In this instance, this Court will apply the equivalent of a rational basis test to the enactment and subsequent implementation of article 19A, according to which this Court presumes constitutionality and leaves the burden to Plaintiffs to that the state action was not "rationally related to a legitimate state interest." *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Choosing among the degrees of scrutiny – ranging from strict to intermediate to rational basis – comes down to the severity of the burden being imposed on the right to vote. *See Burdick*, 504 U.S. at 433-34. Notably, the law in this instance does not remove the right to vote from any individual, and indeed expands the right for all Illinois voters. Plaintiffs argue that it expands the right for some more than others; however, this is an effect rather than a purpose of the law, and in any event goes toward questions of ease of voting rather than outright denial of any fundamental right. We find that Defendants' actions or inaction in this matter are more similar to the minimal burden that "election laws will invariably impose...upon individual voters." *Burdick*, 504 U.S. at 433-34. This Court need only determine if the action taken is "rationally related to a legitimate state interest," *Hendrix v. Evans*, 972 F.2d 351 (7th Cir. 1992) (citing *Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 440 (1985); *Zobel v. Williams*, 457 U.S. 55, 60 (1982)).

This reasoning is bolstered by language of the Supreme Court in *McDonald*, which considered absentee voting in Illinois and applied language that could easily be carried over to the instant matter:

> It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. Despite appellants' claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise; nor, indeed, does Illinois' Election Code so operate as a whole, for the State's statutes specifically disenfranchise only those who have been convicted and sentenced, and not those similarly situated to appellants.

*Id.* The law in this case is even more expansive than that considered in McDonald, as it provides additional voting rights for all individuals rather than a particular group. Therefore, this Court finds that Defendants need only establish a rational basis for their actions in order to warrant summary judgment of the equal protection claim.

Plaintiffs maintain that the State Board failed to meet the challenge and wield its authority under the Election Code to ensure the constitutional application of this law. Defendants have done little to explain their decision not to supplement the law with additional policies or regulations – though it was within their power to do so – other than to point out that it was not required of them. However, the burden is on Plaintiffs to show that "no set of circumstances exist under which the Act would be valid." *U.S. v. Salerno*, 481 U.S. 739, 745 (1987); *see also FCC v. Beach Communications, Inc.*, 508 U.S. 307, ----, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993) (finding that a legislative action "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."). The State Board's inaction amounts to a reasonable approach toward its duties under the law, as there are many rational bases on which its decision could have been made.

As stated above, it is certainly clear that the State Board has a great many duties to fulfill with respect to the voting procedures, and a great degree of discretion with which to fulfill them. However, when discussing these duties it should be noted that the Board's powers under the

Election Code are created entirely by the state legislature, and it should properly be understood as acting in cooperation with it. Therefore, it is only right and reasonable that they allow time for implementation of the laws as written before they would even consider supplementing those duly considered legislative acts with their own rules and policies. In addition, the State Board is well within its appropriate duties in deferring to the law out of respect for the process of legislating itself, according to which Defendants could have reasonably assumed that policy research, statewide interests, and/or economic considerations had all been incorporated into the nascent early voting scheme. Finally, the Board might have seen article 19A for what it was, a conscious choice to leave significant decision making authority with local authorities, allowing each voting district to tailor its approach to early voting in a matter consistent with its unique demands and abilities. All of these are valid state interests on which the State Board's failure to supplement article 19A might be based.

To the extent that Defendants chose not to act, their decision was rationally based on a valid regulatory interest.

### iii. *Judicial intervention inappropriate*

Plaintiffs claim that they will "suffer irreparable injury if this Court does not require defendants to provide access to early voting to all citizens on the same terms and conditions." 2nd Am. Compl. ¶ 63. The threat of this injury is not sufficiently clear to demand action from the State Board, much less intervention by this Court. Federal intrusion is even more inappropriate in light of the nascency of the legal regime and the highly localized nature of the issues involved.

The above language explaining the rationality of Defendants' position not intended to convey that the State Board was correct in deciding not to supplement the early voting law, or that it should not do so in the future. This Court merely intends to show that under the appropriate level of scrutiny, Defendants' failure to act was rationally based on a valid state interest and cannot be condemned as a constitutional violation. Clarification of the state's early voting law for future elections may prove to be the wisest path; in light of the State Board's clear mandate to ensure efficient and fair operation of the Election Code, we encourage Defendants to monitor the use of early voting and implement clearer guidelines for its use should they prove necessary. However, at this early stage this Court sees no constitutional basis for intervening in what is essentially a matter of line-drawing appropriately considered at the state level.

As an example, consider a single issue brought up by article 19A – say, the number of permanent polling stations. The question to be decided is whether a proper approach requires none, one, a fixed per capita number, or some other more complex formula for calculating the appropriate number in each district. The problem with Plaintiffs' approach, however, is that in enacting this voting program the state legislature has already answered this question; in light of the distinctly local factors of expense, efficiency, history, demographics, geography, and culture, they determined that it was appropriate to require only a single location and otherwise grant each voting district significant discretion in determining whether to go above and beyond that requirement. That this wide discretion might be applied inconsistently from one jurisdiction to another is to be expected where *de minimis* standards are created. Does this make the law inappropriate or discriminatory? No more so than any election policy allowing for localized discretion. Is there room for improvement? Certainly, but the delicate regulatory line-drawing

that is required is to be done by the uniquely qualified state entities most familiar with the relevant factors.

This Court's reasoning parallels that of *Griffin*, 385 F.3d 1128. There, the Seventh Circuit found that the plaintiff class of working mothers had a legitimate interest in seeing absentee voting rights expanded so that they would not be restricted to a single day of voting. However, the state also had a legitimate interest in minimizing the total use of absentee ballots as a means of "discouraging fraud and other abuses and encouraging turnout." *Id.* at 1131. Because the balancing of these interests was "quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry," *id.* at 1131, the court found that judicial intervention was inappropriate. Moving to an equal protection analysis, the court found that even the fact that plaintiffs or those similarly situated would likely be more inconvenienced than others due to the combined effect of an inability to vote absentee and the chosen locations of polling places, this did not amount to a constitutional violation. "[U]navoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate policy, do not violate equal protection." *Id.* at 1132 (citing *Apache Bend Apartments, Ltd. v. U.S. Through I.R.S.*, 964 F.2d 1556, 1569 (5th Cir. 1992); cf. *Smith v. Boyle*, 144 F.3d 1060, 1064 (7th Cir. 1998); *Bell v. Duperrault*, 367 F.3d 703, 712 (7th Cir. 2004)).

This is similarly true in this instance, in light of the deference to be given to the decision making of the Illinois legislature and the State Board. Essentially, Defendants are allowed a great deal of leeway with respect to voting mechanisms, where the impact of changes may

evolve over time and not all potential effects on an electorate can be foreseen.  The language of

the Supreme Court in *McDonald* is equally true here:

> Legislatures are presumed to have acted constitutionally even if source
> materials normally resorted to for ascertaining their grounds for action are
> otherwise silent, and their statutory classifications will be set aside only if
> no grounds can be conceived to justify them.  With this much discretion, a
> legislature traditionally has been allowed to take reform one step at a time,
> addressing itself to the phase of the problem which seems most acute to
> the legislative mind, and a legislature need not run the risk of losing an
> entire remedial scheme simply because it failed, through inadvertence or
> otherwise, to cover every evil that might conceivably have been attacked.

394 U.S. at 809.

At this stage, there is no reason for this Court to intervene.  The intent of article 19A was

to expand voter rights in Illinois to allow an early vote for all citizens.  While that expansion

may have been uneven, the legislature and the State Board's decision to create and promulgate

only minimal standards was not unconstitutional.  As Plaintiffs themselves acknowledge, "in

Illinois early voting is still at an early take-off stage."  Pls.' Opp. to Summ. J. at 2.  Therefore,

the Board's choice not to implement supplemental regulations and policies at this point, in light

of the minimal evidence of present constitutional harm and likelihood of the program evolving

into the future, does not warrant judicial intervention.  At some point this balancing of interests

may change, but the evidence now presented to this Court does not warrant additional

consideration.

**4.      CONCLUSION**

There is no doubt that there are some differences in the manner in which Section 19 is

being applied in different districts.  At this point, however, Plaintiffs have advanced insufficient

evidence from which a reasonable factfinder could find that the inconsistencies from one

jurisdiction to the next are so great that the Federal judiciary must intervene and force the state Board to reconsider how it applies duly considered state election law.

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is DENIED.  This case is CLOSED.


Enter:


/s/ David H. Coar

_____

David H. Coar
United States District Judge

Dated: **September 28, 2007**